# UNITED STATES DISTRICT COURT
## IN THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br> v.<br><br> AXIS LED GROUP, LLC, a limited liability company;<br><br> ALG-HEALTH LLC, a limited liability company; and<br><br> ADAM J. HARMON, individually and as an officer of AXIS LED GROUP, LLC and ALG-HEALTH LLC,<br><br>  Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, AND OTHER RELIEF** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC" or "Commission"), pursuant to Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1.    Plaintiff brings this action under Sections 5(m)(1)(A), 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b; the COVID-19 Consumer Protection Act of the 2021 Consolidated Appropriations Act (the "COVID-19 Act"), Pub. L. No. 116-260, 134 Stat. 1182, Title XIV, § 1401(b)(1); and Section 323.4 of the Made in USA Labeling Rule (the "MUSA Labeling Rule"), 16 C.F.R. § 323.4, which together authorize the Plaintiff to seek, and the Court to order, permanent injunctive relief, monetary relief, civil penalties, and other relief for the numerous acts and practices of Defendants Axis LED Group, LLC, ALG-Health LLC, and Adam J. Harmon in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52 and in violation of the Made in USA Labeling Rule, 16 C.F.R. Part

323, described herein.  These deceptive acts or practices include but are not limited to: (1) the labeling and advertising of certain products containing significant imported content as "Made in USA;" and (2) the making of other false or misleading claims relating to Defendants' personal protective equipment products and the prevention or mitigation of COVID-19.

**Jurisdiction and Venue**

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

**Plaintiff**

4.     This action is brought by the United States of America on behalf of the FTC.  The FTC is an independent agency of the United States Government given statutory authority and responsibilities.  15 U.S.C. §§ 41-58.  The FTC enforces Sections 5(a) of the FTC Act, 15 U.S.C. §§ 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  The FTC also enforces the COVID-19 Act, which provides for civil penalties for any person who engages in a deceptive act or practice in or affecting commerce associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19 for the duration of the COVID-19 public health emergency.  Pub. L. No. 116-260, Title XIV, § 1401(b)(1).  The FTC also enforces the MUSA Labeling Rule, which prohibits labeling any product with an unqualified "Made in USA" or equivalent claim unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all

ingredients or components of the product are made and sourced in the United States.  16 C.F.R. § 323.2.

## Defendants

5.      Defendant Axis LED Group, LLC ("Axis") is an Ohio limited liability company with its principal place of business at 520 West Mulberry Street, Bryan, Ohio 43506.  Axis transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Axis has advertised, marketed, distributed, or sold light-emitting diode ("LED") or personal protective equipment ("PPE") products to consumers throughout the United States.

6.      Defendant ALG-Health LLC ("ALG-Health") is an Ohio limited liability company with its principal place of business at 520 West Mulberry Street, Bryan, Ohio 43506.  ALG-Health transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, ALG-Health has advertised, marketed, distributed, or sold LED or PPE products to consumers throughout the United States.

7.      Defendant Adam J. Harmon ("Harmon") is the President and Chief Executive Officer of both Axis and ALG-Health.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Axis and ALG-Health, including the acts and practices set forth in this Complaint.  Defendant Harmon resided in this District at the time of the matters alleged herein, and, in connection with those matters, transacts, or has transacted, business in this District and throughout the United States.

**Common Enterprise**

8.     Defendants Axis and ALG-Health (collectively, "ALG" or "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds.

9.     Specifically, at all times relevant to this Complaint, the Corporate Defendants operated under Defendant Harmon's unified control.  Defendant Harmon directed the Corporate Defendants' business and marketing activities interchangeably through his Axis and ALG-Health email addresses, ordered and received ALG-Health shipments under the Axis name, commingled corporate funds, and housed corporate activities in the same physical space.

10.     Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

**Commerce**

11.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**Defendants' Business Activities**

12.     Defendant Harmon formed Axis in Ohio in 2015.  Exhibit A.

13.     Defendant Harmon filed articles of incorporation for ALG-Health in Ohio in June 2020.  Exhibit B.

14.     As described in Paragraph 9, at all times material to this Complaint, Defendant

Harmon served as an officer of the Corporate Defendants, which he operated as a unified entity.

15.     Defendant Harmon holds sole responsibility for, and has directed publication of, all ALG marketing claims.

### Defendants have falsely marketed, labeled, and sold wholly imported Chinese lighting products, or products containing significant Chinese inputs, as Made in the United States.

16.     Since 2015, ALG has marketed and sold LED lights, tubes, and fixtures to consumers and the United States government.

17.     In 2016, the Commission received reports that ALG falsely advertised a line of imported LED bulbs called "Patriot Tubes" as Made in the United States ("MUSA").

18.     Specifically, ALG blanketed its website and social media with unqualified U.S.-origin claims for these products, stating the Company's "advances in manufacturing processes and efficiency have finally allowed us to produce USA-made products at competitive prices." Exhibit C.

19.     During the FTC's investigation of these reports, Defendant Harmon admitted Patriot Tubes included significant Chinese components.  However, Defendant Harmon claimed Patriot Tubes were assembled in the United States.

20.     Defendant Harmon asserted Patriot Tubes qualified as "domestic end products" under the Buy American Act, 41 U.S.C. §§ 8301-8305 ("BAA"),[1] and produced a letter purportedly confirming this fact.  Exhibit D.

21.     During the 2016 investigation, Defendant Harmon reviewed and acknowledged

---

[1] BAA establishes preferences for domestic end products and construction materials in government acquisitions, and defines those terms as they are used in that limited context. *See* 48 CFR § 25.003 (stating that for purposes of BAA, "domestic end product[s]" and "domestic construction material[s]" include, among other things, certain manufactured products or materials where either the cost of the components mined, produced, or manufactured in the United States exceeds 50% of the cost of all components, or the product or material is a commercially available off-the-shelf item).

FTC guidance and caselaw providing that marketers should not claim products are MUSA unless they can substantiate such products are "all or virtually all" MUSA.  Defendant Harmon agreed to market his products consistent with FTC guidance and caselaw going forward.

22.     On January 18, 2017, FTC staff issued a letter on the public record explaining the investigation into ALG was closed based on Defendant Harmon's: (1) production of a certificate stating his products qualified as "Domestic End Products" under the BAA; (2) commitment to remove all unqualified MUSA claims from his website; and (3) agreement to qualify "Buy American Act Compliant" claims on any marketing materials not specifically targeted at government purchasers.  The letter reiterated guidance and caselaw previously discussed with Defendant Harmon providing that marketers should not make unqualified MUSA claims unless the products advertised are "all or virtually all" MUSA.  Exhibit E.

23.     Since 2017, in numerous instances, Defendants have continued to market Patriot LED products to consumers and the U.S. government as "Assembled in the USA" and "Buy American Act Compliant" including, but not limited to, through the following statements and depictions:





Exhibit F, Axis LED Catalogue.

24.     In truth and in fact, in numerous instances, ALG wholly imports these products from China.

25.     In numerous instances, ALG employees have peeled "Made in China" stickers off LED products in ALG facilities and replaced them with MUSA labels.  Exhibit G, Morlock Decl. at ¶¶ 5-8; *see also* Exhibit H, Hutson Decl. at ¶ 5 (stating the lighting operation consisted of simply re-boxing Chinese lighting products).

26.     Since 2015, ALG has supplied hundreds of thousands of lights to consumers and the U.S. government that underwent no manufacturing in the United States, other than occasional quality checks.  Exhibit G, Morlock Decl. at ¶ 9.

**During the COVID-19 pandemic, Defendants falsely marketed, labeled, and sold wholly or partially imported Chinese PPE as MUSA, and made other deceptive claims for PPE.**

27.     On January 31, 2020, Health and Human Services Secretary Alex M. Azar II, pursuant to his authority under Section 319 of the Public Health Service Act, declared a public health emergency, which remained in effect throughout the activities detailed below, and beyond.  On March 11, 2020, the World Health Organization declared the 2019 novel coronavirus ("COVID-19") outbreak a global pandemic.[2]

---

[2] *See* WHO Director-General's Remarks (March 11, 2020), *available at* https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19 -- 11-march-2020,

28.     In early 2020, seeking to capitalize on demand because of the COVID-19 pandemic, ALG began selling PPE, including KN95 respirators,[3] gloves, and gowns, out of ALG's facility in Defiance, Ohio.

29.     In March 2020, Defendants began operating as ALG-Health.

30.     ALG-Health primarily markets and sells PPE products online, through its own website, alg-health.com, and through www.stockmedicalsuppply.com.

31.     In late 2020, based on documentation supplied by ALG-Health, the National Institute for Occupational Safety & Health ("NIOSH")[4] certified certain of Defendants' masks as N95 respirators.

32.     Starting in 2020, Defendants disseminated or caused to be disseminated, advertisements, packaging, and promotional materials for PPE products, including, but not necessarily limited to, the attached Exhibits I-M:

---

[3] A respirator labeled as a KN95 respirator is expected to conform to China's GB2626 standard.

[4] The Occupational Safety and Health Act of 1970, codified at 29 U.S.C. §§ 651-678, established NIOSH as a research agency focused on the study of worker safety and health, and empowering employers and workers to create safe and healthy workplaces. NIOSH is part of the U.S. Centers for Disease Control and Prevention, in the U.S. Department of Health and Human Services. *See* https://www.cdc.gov/niosh/about/default.html.  Among other things, NIOSH approves N95 respirators using standards promulgated under 42 C.F.R. § 84.  NIOSH does not approve KN95 products, or any other respiratory protective devices certified to international standards.

a.    "Manufactured in USA"







Exhibit I, Composite Exhibit, ALG Health website and social media posts.

b. "Made in USA"





Exhibit J, Composite Exhibit, ALG Social Media Posts.

    c.       "ALG Health is producing N95 respirators and disposable masks that are

100% Made in the USA for our men and women first responders, medical

personnel, military, government agency, and humanitarian efforts."

Exhibit K, ALG YouTube Video.

    d.

| AN AMERICAN SOLUTION |
|---|
| Our manufacturing facility was built in NW Ohio and is completely staffed by American workers, making ALG Health one of the very few PPE facilities in America that is 100% Made in the USA. We are fully Berry Amendment (10 U.S.C 2533a) compliant and adhere to the laws passed by the United States Congress. |

Exhibit L, alg-health.com (webarchive.org capture from Dec. 28, 2020).

e.     Healthcare customers should "purchase American-made PPE and masks so that our heroic frontline workers do not have their safety put at risk by relying on foreign-made products"; and "imported products are not tested and could be unsafe."  Exhibit M, Composite Exhibit, ALG Social Media Posts.

33.     In numerous instances, including but not limited to the promotional materials referenced in Paragraph 32, Defendants have represented, expressly or by implication, that their PPE products are all or virtually all made in the United States.

34.     In numerous instances, including but not limited to the promotional materials referenced in Paragraph 32, Defendants have represented, expressly or by implication, that because they are all or virtually all made in the United States, Defendants' products are safer or provide superior protection from COVID-19.

35.     In fact, in numerous instances, the products advertised using the statements described in Paragraph 32 were wholly imported from China.  *See* Exhibit G, Morlock Decl. at ¶¶ 24, 33 ("Probably 90% of the masks Mr. Harmon sold were brought in from China as finished masks.  Maybe more."); Exhibit H, Hutson Decl. at ¶¶ 7, 14 ("If I had to guess I would estimate there was a 90%-10% split between the ALG masks that were wholly imported and those that were 'made' in Ohio."); Exhibit N, Feeney Decl. at ¶ 28 ("If I had to guess, I would say probably 80% or so of the masks we sold were imported masks.").

36.     Indeed, in numerous instances, Defendants received Chinese KN95s, unpacked the completed respirators, stripped off Chinese origin labels, printed ALG and NIOSH labels on the respirators, and then re-boxed the respirators in ALG packaging with MUSA labels.  Exhibit G, Morlock Decl. at ¶ 24 ("[H]undreds of thousands of Chinese masks were arriving from Venas.

As each shipment arrived, we unpacked the Chinese masks, printed them with the ALG logo and NIOSH markings, and re-boxed them into Patriot Mask packaging with 'Made in USA' written on it."); Exhibit H, Hutson Decl. at ¶ 7 ("I witnessed ALG Health employees putting Chinese respirators in ALG boxes and labeling them as 'Made in USA.'").

37. In other instances, the products advertised using the statements described in Paragraph 32 undergo some finishing in the United States, but still incorporate all Chinese materials. Exhibit G, Morlock Decl. at ¶ 20 ("From the beginning and at all times, all our masks and mask-making materials came from China."); Exhibit H, Hutson Decl. at ¶¶ 11-12 ("During my time at ALG, the company had some capacity to make masks on a very small scale, but never enough to cover the orders the company received. To the extent ALG did make some masks in the United States, all the materials used to make the masks were imported from China."); Exhibit N, Feeney Decl. at ¶ 28 ("Maybe 20% of the masks ALG sold were made in Ohio; all the materials used to make those masks were imported.").

38. Therefore, Defendants' express or implied representations that its PPE products are all or virtually all made in the United States are false.

39. In August 2021, Defendants placed a notice on their website announcing a voluntary stop-sale of all NIOSH-certified products pending resolution of a NIOSH nonconformance investigation. Exhibit O.

40. Despite this notice, Defendants continued to market their products as MUSA, and NIOSH-certified N95s,[5] and sell them to consumers. Exhibit G, Morlock Decl. at ¶¶ 50-53

---

[5] NIOSH recorded the NIOSH stylized logo with and without text, as well as the certification marks N95, N99, N100, P95, P100, and the term "NIOSH-approved," with the U.S. Patent and Trademark Office. NIOSH permits manufacturers to use these certification marks only if they are NIOSH-approval holders because of their products satisfying the NIOSH's regulatory

("Eventually, in summer 2021, NIOSH ordered us to stop selling.  Mr. Harmon buried a disclaimer on his website about the stop sale, but would tell people on the phone who asked about it that it was not a big deal . . . Mr. Harmon never stopped selling masks; he told us the stop-sale only applied to ALG Health and he could continue to sell masks through Axis LED."); Exhibit N, Feeney Decl. at ¶ 36 ("Despite the August 2021 NIOSH stop-sale, Mr. Harmon continued to sell respirators with NIOSH markings.").

41.     In January 2022, NIOSH published a notice on the cdc.gov website stating ALG voluntarily rescinded all NIOSH respirator approvals and ALG respirators bearing the referenced approval numbers could no longer be manufactured, assembled, sold, or distributed.  Exhibit P.[6]

42.     Despite this notice, Defendants continued to market certain of the identified products as MUSA and NIOSH-certified N95s, and sell these products to consumers.  Exhibit Q, Images of ALG Respirators Purchased February 2022; Exhibit R, ALG Instagram Feed (Feb. 3, 2022); Exhibit S, ALG Specification Sheet (Jan. 27, 2022).

43.     Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants have engaged in their unlawful acts and practices repeatedly over at least a five-year period, Defendants have engaged in their unlawful acts and practices willfully and knowingly, and Defendants have continued their unlawful activities despite a previous FTC investigation, and investigations by other federal government agencies.

---

standards set forth in 42 C.F.R. Part 84.  *See* https://www.cdc.gov/niosh/npptl/usernotices/counterfeitResp.html.

[6] *See also* NIOSH Respiratory Protective Device Information (Jan. 11, 2022), https://www.cdc.gov/niosh/npptl/resources/pressrel/letters/respprotect/CA-2022-1042.html.

## The Individual Defendant's Knowledge

44.     At all times relevant to this Complaint, Defendant Harmon had sole responsibility for creating, developing, approving, implementing, overseeing, or ensuring compliance with company policies and procedures.

45.     At all times relevant to this Complaint, Defendant Harmon had sole responsibility for and control and decision-making authority over product marketing and labeling, including U.S.-origin claims.

46.     In 2016, Defendant Harmon acknowledged he was aware of and understood FTC guidance and caselaw providing that marketers must not make unqualified MUSA claims unless the advertised products are all or virtually all MUSA.

47.     As described in Paragraphs 21-22, in 2016, Defendant Harmon specifically agreed, among other things, to market his products consistent with the FTC guidance and caselaw providing that marketers must not make unqualified MUSA claims unless the advertised products are all or virtually all MUSA in order to resolve an FTC investigation into allegations he deceptively marketed his products.

48.     In 2017, Defendant Harmon acknowledged receipt of a letter from FTC staff reiterating the FTC guidance and caselaw referenced in Paragraph 47, and Defendant Harmon's agreement to market his products consistent with such guidance.

49.     At all times relevant to this Complaint, Defendant Harmon was aware that ALG products incorporated significant imported content and, in many cases, were wholly imported.

50.     Indeed, Defendant Harmon's name and contact information appears on commercial invoices for imported, completed masks.  Exhibit N, Feeney Decl. at pp. 8-11.

51.     Despite this knowledge, Defendant Harmon repeatedly asserted in marketing materials and on labels that such products were all or virtually all and, in some cases, 100% MUSA.

52.     Moreover, Defendant Harmon repeatedly published articles and marketing materials stating or implying ALG products were safer or otherwise superior to imported products.

## Violations of the FTC Act

53.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

54.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

55.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For purposes of Section 12, facemasks sold by Defendants are "devices" as defined in Section 15(d) of the FTC Act, 15 U.S.C. § 55(d).

56.     Enacted on December 27, 2020, the COVID-19 Act provides for civil penalties for any person who engages in a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), that is associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19 during the public health emergency declared on January 31, 2020, pursuant to Section 319 of the Public Health Service Act.  Pub. L. No. 116-260, Title XIV, § 1401(b)(1).

57.     The COVID-19 Act provides that "[a] violation of subsection (b) shall be treated as a violation of a rule defining an unfair or deceptive act or practice as described under Section 18(a)(1)(B) of the [FTC] Act," 15 U.S.C. § 57a(a)(1)(B).

58.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $46,517 for each violation of Section 5(a) of the FTC Act pursuant to the COVID-19 Act.

## Count I
## FTC Act Violation – MUSA Claims for LED Products

59.     In numerous instances since 2016, in connection with the advertising, marketing, promotion, offering for sale, or sale of LED lights, Defendants have represented, directly or indirectly, expressly or by implication, that their goods are all or virtually all made in the United States, or assembled in the United States.

60.     In truth and in fact, in numerous instances, Defendants' LED products are wholly imported, or incorporate significant imported materials or subcomponents.

61.     Therefore, Defendants' representations as set forth in Paragraph 59 are false, misleading, or unsubstantiated, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## FTC Act Violation – MUSA Claims for PPE Products

62.     In numerous instances since 2020, in connection with the advertising, marketing, promotion, offering for sale, or sale of PPE, Defendants have represented, directly or indirectly, expressly or by implication, that their goods are all or virtually all made in the United States.

63.     On or after December 27, 2020, Defendants made the representations set forth in Paragraph 62, which are associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19.

64.     In truth and in fact, in numerous instances, Defendants' PPE products are wholly imported, or incorporate significant imported materials or subcomponents.

65.     Therefore, Defendants' representations as set forth in Paragraphs 62-63 are false, misleading, or unsubstantiated, and constitute deceptive acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

66.     Defendants committed the violations set forth in Paragraphs 62-64 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## <u>Count III</u>
### <u>FTC Act Violation – Other False or Deceptive Claims for PPE Products</u>

67.     In numerous instances since 2020, in connection with the advertising, marketing, promotion, offering for sale, or sale of PPE, Defendants have represented, directly or indirectly, expressly or by implication, that:

  a.     Because they are all or virtually all made in the United States, Defendants' PPE products are safer or provide superior protection from COVID-19 than imported products; and

  b.     Defendants sell NIOSH-certified, U.S.-origin N95 respirators.

68.     On or after December 27, 2020, Defendants made the representations set forth in Paragraph 67, which are associated with the treatment, cure, prevention, mitigation, or diagnosis of COVID-19.

69.     In truth and in fact, in numerous instances, because Defendants' PPE products are wholly imported, or incorporate significant imported materials or subcomponents, Defendants' PPE products are not safer nor do they provide superior protection from COVID-19 than imported products.

70.     In truth and in fact, Defendants do not sell NIOSH-certified, U.S.-origin N95 respirators.

71.     Therefore, Defendants' representations as set forth in Paragraphs 67-68 are false, misleading, or unsubstantiated, and constitute deceptive acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

72.     Defendants committed the violations set forth in Paragraphs 67-69 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## Violations of the MUSA Labeling Rule

73.     Effective August 13, 2021, the MUSA Labeling Rule, 16 C.F.R. Part 323, prohibits marketers from labeling products as "Made in USA" unless: (1) the final assembly or processing of the product occurs in the United States; (2) all significant processing that goes into the product occurs in the United States; and (3) all or virtually all ingredients or components of the product are made and sourced in the United States. 16 C.F.R. § 323.2.

74.     The MUSA Labeling Rule also provides that to the extent any mail order catalog or mail order promotional material includes a seal, mark, tag, or stamp labeling a product "Made in USA," such label must comply with the requirements of 16 C.F.R. §323.2. 16 C.F.R. § 323.3.

75.     For purposes of the MUSA Labeling Rule, "Made in USA" is defined as "any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such

product or service is 'made,' 'manufactured,' 'built,' 'produced,' 'created,' or 'crafted' in the United States or in America, or any other unqualified U.S.-origin claim." 16 C.F.R. § 323.1.

76.     A violation of the MUSA Labeling Rule constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).  15 U.S.C. § 57a(d)(3) and 16 C.F.R. § 323.4.

77.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $46,517 for each violation of the MUSA Labeling Rule.

## Count IV
## MUSA Labeling Rule Violations

78.     In numerous instances since August 13, 2021, Defendants have placed MUSA labels on products containing significant imported components.

79.     In numerous instances since August 13, 2021, Defendants have included images of the labels on products described in Paragraph 78, as well as stylized seals labeling such products MUSA, in mail order promotional material, including on the alg-health.com website and social media platforms.

80.     Defendants applied the labels described in Paragraphs 78-79 to products containing ingredients or components that are not all or virtually all made and sourced in the United States.

81.     Defendants' practices as alleged in Paragraphs 78-80 violate the MUSA Labeling Rule, 16 C.F.R. §§ 323.2, 323.3, and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

82.    Defendants committed the violations set forth in Paragraphs 78-80 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## **Consumer Injury**

83.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the MUSA Labeling Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## **Prayer for Relief**

Wherefore, Plaintiff requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and the MUSA Labeling Rule by Defendants;

B.    Award monetary and other relief within the Court's power to grant;

C.    Award Plaintiff monetary civil penalties from Defendants for each violation of Section 5 pursuant to the COVID-19 Act;

D.    Award Plaintiff monetary civil penalties for each violation of the MUSA Labeling Rule; and

E.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  August 5, 2022

BRIAN M. BOYNTON
Principal Deputy Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

MICHELLE M. BAEPPLER
First Assistant United States Attorney
Northern District of Ohio

s/Brendan F. Barker
BRENDAN F. BARKER (IL: 6299039)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3795
(216) 522-2404 (facsimile)
Brendan.Barker@usdoj.gov

GUSTAV W. EYLER
Director
Consumer Protection Branch

LISA K. HSIAO
Assistant Director

s/ Matthew A. Robinson
MATTHEW A. ROBINSON
ELLEN BOWDEN MCINTYRE
Trial Attorneys Appearing Pursuant to 28 U.S.C. § 517
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
matthew.a.robinson@usdoj.gov
Phone: (202) 305-4342
ellen.bowden.mcintyre@usdoj.gov
Phone: (202) 451-7731

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Of Counsel:

**FEDERAL TRADE COMMISSION**

JAMES A. KOHM
Associate Director

Division of Enforcement

LAURA KOSS
Assistant Director
Division of Enforcement

s/ Julia Solomon Ensor
JULIA SOLOMON ENSOR
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Mail Stop CC-9528
Washington, D.C. 20580
Tel.:  202-326-2377
Fax:  202-326-3197
jensor@ftc.gov